### FRABIL PARTNERSHIP *v.* SUPERVISOR OF ASSESSMENTS OF QUEEN ANNE'S COUNTY

[No. 201, September Term, 1978.]

*Decided February 9, 1979.*

The cause was argued before MELVIN, LISS and WILNER, JJ.

*Alan H. Fisher,* with whom were *Venable, Baetjer & Howard* on the brief, for appellant.

*Kaye T. Brooks, Assistant Attorney General,* with whom was *Francis Bill Burch, Attorney General,* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

The very narrow question before us is whether a certain tract of land owned by appellant should be assessed on the basis of agricultural use, rather than at its full cash value, for the taxable year commencing July 1, 1975. The question is one of statutory construction — the proper interpretation to be given to Md. Annot. Code art. 81, § 19 (b) (2) (A) (iii) as it existed in 1975. The relevant facts, set forth in the record made before the Maryland Tax Court, are not in dispute.

At some point not disclosed in the record appellant agreed to purchase an 874-acre tract of land in Queen Anne's County. The tract appears to comprise all, or most, of Wye Island, an island located between the Wye and the Wye East Rivers. Appellant actually acquired title to the land by deed dated December 3, 1974. In June, 1974 (some six months before it acquired title to the property), J. R. McCrone, Jr., Inc., a surveyor commissioned by it for that purpose, prepared for appellant a plat, showing a subdivision of the entire tract into 35 lots, ranging in size from 74 ± acres to 15 ± acres. The plat showed three 50-foot roads or rights-of-way running through the property, plus an access road to the mainland, that, in effect, separated the lots into four groups. Each lot had substantial frontage on the water (ranging from 600 feet to 2,200 feet), and each had access to one of the rights-of-way depicted on the plat.

At the times relevant to this proceeding, the plat had not been recorded, none of the roads shown on it had been built, and no actual "development", in terms of construction or public works agreements, had taken place. Indeed, it is

conceded that, at all such relevant times, the land was used for agricultural purposes.

What triggered this dispute was the sale of two parcels of the tract in June 1975. One parcel, consisting of approximately 75 acres, was sold by appellant to a Laurence Leonard, and the other, consisting of some 52 acres, was sold to Larry and Esther Stanton. In each of the two deeds, the lot conveyed was described — i.e., its perimeter was determined — by courses and distances, and not by direct reference to any plat. In each case, however, the deed did refer to a McCrone survey. The last sentence of the description paragraph, following directly after the recitation of courses and distances, states: [1]

> (1) in the Leonard deed: "Containing in all 75.27 acres of land, more or less, as surveyed by J. R. McCrone, Jr., Inc., Registered Professional Engineers and Land Surveyors."
>
> (2) in the Stanton deed: "Containing in all 52.15 acres of land, more or less, as described by J. R. McCrone, Jr., Inc., Registered Engineers and Land Surveyors."

The uncontradicted testimony of the Supervisor of Assessments for Queen Anne's County, given before the Tax Court, was that in June 1975 "[t]here was a fairly active sales campaign" with respect to the overall tract, and that, in connection with that effort, the McCrone plat "was available, made available to the public, which described the individual

---

[1]. There is apparently some confusion with respect to this reference. In its "Memorandum of Grounds for Decision", the Tax Court stated: "The deed descriptions of the property conveyed to Stanton and Leonard was in metes and bounds, *and contained no reference to a plat.*" (Emphasis supplied.) This is literally true. However, in connection with each deed there was a plat of the particular lot conveyed, prepared by McCrone and dated May 1975. In the course of offering the plat attached to the Stanton deed into evidence, counsel for appellant noted that it was "parcel 34". The lot shown on that plat, identified there as Farm # 34, appears to be the same lot described on the June 1974 plat as Lot No. 34. Similarly, the lot depicted on the McCrone plat attached to the Leonard deed, identified there as Farm # 3, appears to be the same lot described on the 1974 McCrone plat as Lot No. 3. The clear inference, which is nowhere challenged or contradicted, is that the lots conveyed by these two deeds were, in fact, those shown on the 1974 McCrone subdivision plat, and that the 1975 plat was but a more precise and detailed description of the lot.

parcels." Gleaning from a somewhat imprecise record, what apparently occurred was that appellant conducted (or proposed to conduct) an auction of some type in order to sell off the various lots, as shown on the 1974 McCrone plat, and that Leonard and Stanton purchased their respective lots directly from appellant in advance of that auction.

When the two deeds in question were recorded, the Supervisor of Assessments, in the belief that the 874-acre tract had been "subdivided", assessed all three parcels — the two conveyed and the remaining part of the tract — at full cash value rather than on the basis of agricultural use. The county property tax appeal board affirmed that determination; but, upon appellant's appeal, the Maryland Tax Court reversed and directed that the lands in question be assessed "at the rates pertaining to farm and agricultural use in Queen Anne's County". On the Supervisor's appeal from that determination, the Circuit Court for Queen Anne's County reversed the Tax Court. We shall affirm the decision of the circuit court.

Section 19 (b) is a long and complex statute. The essence of it, in terms of this proceeding, is contained in the first sentence of subparagraph (b) (1) and in the first sentence of subparagraph (b) (2) (A) (iii). These provisions are (or, in 1975, were) as follows:

(b) (1): "Lands which are actively devoted to farm or agricultural use shall be assessed on the basis of such use, and shall not be assessed as if subdivided, it being the intent of the General Assembly that the assessment of farmland shall be maintained at levels compatible with the continued use of such land for farming and shall not be adversely affected by neighboring land uses of a more intensive nature."

(b) (2) (A): "The following lands shall not be subject to the provisions of paragraph (1) hereof:

. . . (iii) Lands which, after July 1, 1972,

are subdivided into lots or parcels from and after the first day of the taxable year in which the subdivision occurs, as evidenced by a recorded plat or by a known unrecorded plat used for purposes of selling or conveying lots or parcels, even though the deed descriptions of the lots or parcels make no reference to any such plat; provided that lands which are subdivided in order to convey a single lot or parcel to a member of the immediate family of the owner for his residential purposes or in order to dedicate or convey one or more lots or parcels for public school or park purposes shall not thereby be excluded from the provisions of paragraph (1) hereof."

As we noted in the opening paragraph of this opinion, the question here is solely one of statutory construction. More precisely, the question is whether this 874-acre tract was "subdivided" by reason of the sale (and the manner of sale) of the two lots. Initially, we observe that the word "subdivide" is not defined, either in § 19 or elsewhere in article 81, in any of its forms or tenses.

The Supervisor, urging that the word "subdivided" be given its "ordinary and accepted meaning", points to Webster's dictionary definition of "subdivide", which he records as "to divide into several parts; *esp.*: lay out a subdivision on (unimproved land)." [2] This, he says, is what the word means, and this, he says, is precisely what appellant did. Appellant, on the other hand, claims that this is too simplistic. It urges that we look to the various county planning and

---

2. Webster's New Twentieth Century Dictionary (Unabridged) provides this definition: "1. to divide further after previous division has been made. 2. to divide (land) into small parcels for ready sale." Webster's 3rd New International Dictionary (Unabridged) states, in relevant part: "1. to further divide (what has already been divided): divide the parts of into more parts. . . . 2. to divide into several parts . . . ; *esp.*: to divide (a tract of land) into building lots: lay out a subdivision on (unimproved land)."

zoning regulations, all of which are different, but most of which consider the word "subdivide" or "subdivision" in the context of some minimum size lots, and that we construe the State law by reference to these varying local definitions.

We do not find the statute, as it existed in 1975, to be ambiguous, or to permit the interpretation suggested by appellant. Paragraph (b) (2) (A) (iii) excluded from the beneficial assessment lands which are "subdivided into lots or parcels." It did not say physically staked out; it did not say subdivided into lots less than a certain size; it did not require the lots to be developed; it did not require public works agreements, or the building of roads, or the arrangement of construction financing. It sufficed if the subdivision was "evidenced by a recorded plat or by a known unrecorded plat used for purposes of selling or conveying lots or parcels." The evidence before the Tax Court clearly established that this tract was subdivided, and that the subdivision was evidenced by a known plat used for purposes of selling the lots laid out on that plat. Had the General Assembly, when enacting paragraph (b) (2) (A) (iii) in 1972, intended to exclude or permit the exclusion from its purview subdivisions involving lots over a certain size, it could easily have so provided, as it purported to do when it amended the law in 1976.

Neither is there any basis in the statute itself, or in the legislative history of it, to suggest that the General Assembly intended the scope of this exclusion to be defined by reference to local regulations that vary from county to county. Not only would such a construction raise serious Constitutional questions under the uniformity requirement of Article 15 of the Declaration of Rights, but it would, in addition, be tantamount to a delegation of authority, *sub silentio,* for the county governments to determine the *State* property tax yield. The farmland assessment law is a uniform, State-wide law, and it is to be applied in like fashion throughout the State.

*Judgment affirmed; appellant to pay
the costs.*